**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **RAYMOND EARL EDMOND,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **Civil Action No.  3:18-CV-0677-BH** |
| | § | |
| **NANCY BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

By consent of the parties and the order of reassignment dated August 21, 2018 (doc. 23), this case has been transferred for the conduct of all further proceedings and the entry of judgment. Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings.

## I.  BACKGROUND[1]

### A.  Procedural History

Raymond Earl Edmond (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for supplemental security income (SSI) under Title XVI of the Social Security Act. (R. at 1, 202.)  On June 6, 2014, Plaintiff filed his application for SSI, alleging disability beginning on April 23, 2010. (R. at 202.)  His claim was denied initially and upon reconsideration.  (R. at 43, 55.)  Plaintiff requested a hearing before an administrative law judge (ALJ), and he personally appeared and testified at a hearing on April

---

[1]  The background information is summarized from the record of the administrative proceeding, which is designated as "R."

21, 2017.  (R. at 10-32.)  On July 17, 2017, the ALJ issued a decision finding that he was not disabled and denying his claim for benefits.  (R. at 56-72.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council.  (R. at 200-01.)  The Appeals Council denied his request for review on January 18, 2018, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-5.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## B.    Factual History

### 1.    Age, Education, and Work Experience

Plaintiff was born on July 12, 1954, and was 62 years old at the time of the hearing before the ALJ. (R. at 16, 202.)  He left school in the 12th grade, but did not receive a diploma.  (R. at 16.)  He could speak and understand English, but could not read or write.  (*Id.*)  He had past relevant work as a warehouse worker, a janitor, and a home health aide.  (R. at 13.)

### 2.    Medical Evidence

On July 28, 2014, licensed psychologist, Dr. Linda Ludden, Ed.D. completed a Confidential Cognitive Report based on her July 4, 2014 physical examination of Plaintiff (R. at 331-36.) Plaintiff was driven to the appointment by his mother, and she participated in the mental examination.  (*Id.*)  He had an abnormal gait and problems walking. (R. at 331.)  Plaintiff reported experiencing various symptoms, including sleep issues, feelings of inadequacy, self-deprecation, inappropriate guilt, decreased attention and concentration, social withdrawal, brooding, loss of interest or pleasure in most activities, increased appetite, feelings of sadness, psychomotor agitation, and irritability.  (R. at 331-32.)  It was noted that those symptoms had met the criteria for severe persistent depressive disorder. (*Id.*)

Plaintiff reported experiencing depressive symptoms after he stopped working seven years earlier. (R. at 332.) He applied for jobs but couldn't get hired. (*Id.*) He noted that his teeth were "raggedy," and he needed a medical checkup, but he could not go to the doctor because he lacked health insurance. (*Id.*) He was embarrassed that he could not work due to his inability to read. (*Id.*) Plaintiff's mother stated that he was promoted through school up to the eleventh grade without understanding content. (*Id.*) She noted that Plaintiff was illiterate and was able to compensate for his illiteracy by having his family members read and fill out necessary paperwork for him. (*Id.*) Plaintiff stated that modern technology "affects" him, and he did not know how to use computers. (*Id.*) He had one year of special education when he was in the seventh grade. (*Id.*)

Plaintiff worked as a janitor at a school from 1995 to 2000, which he considered difficult because he was required to read chemicals. (R. at 332.) He also worked unloading trucks at a warehouse and at a hardware store for eight years. (*Id.*) He had been a caregiver for the elderly for four years. (*Id.*) He was polite and maintained average eye contact during the examination. (*Id.*) He reported doing okay with chores, but it would sometimes hurt. (*Id.*) He required assistance managing his daily activities, including managing his own money, reading, and filling out applications. (R. at 333). He described his ability to handle unexpected change as "fair," but he also would "get[] upset." (*Id.*) He stated that he did not drive "because of tickets." (*Id.*)

Plaintiff reported having two friends and was able to get along well with his family. (R. at 332.) He got along "fair" with those in authority. (R. at 333). He had severe difficulty staying on task and could not read instructions. (*Id.*) He had never been to the doctor because he did not have medical insurance, and he had the following physical issues: a boil on his lower back; frequent bathroom use; numbness in his hands and feet; poor eyesight; and a knot-like feeling in his stomach.

(R. at 333-34.)  He began smoking when he was eighteen and would smoke half a pack "every once in a while."  (R. at 334.)  He reported drinking "one or two beers a day, seven days a week."  (*Id.*)  Dr. Ludden considered Plaintiff's thought process organized and noted no tangentially, looseness of association, or circumstantiality.  (*Id.*)  Plaintiff did not report any paranoia, delusions, suicidal thoughts, or homicidal ideation.  (*Id.*)  Dr. Ludden assessed his intelligence as "below average," his insight as "average," and his judgment as "satisfactory." (R. at 335.)

Dr. Ludden used the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) and Wechsler Memory Scale – Third Edition (WMS-III) tests to measure Plaintiff's verbal, nonverbal, and general intelligence.  (R. at 335).  Plaintiff had a Full Scale IQ score of 58.  (*Id.*)  He needed the examiner to repeat each question during the oral math subtest, and to read the math problems with writing on the Wide Range Achievement Test (WRAT).  (*Id.*)  He was breathing heavily out of his mouth throughout the testing.  (*Id.*)  Dr. Ludden opined that Plaintiff's overall cognitive ability could not be easily summarized because his nonverbal reasoning abilities were much better developed than his verbal reasoning abilities.  (*Id.*)  His ability to sustain attention, concentrate, and exert mental control, was in the "extremely low range," and his "ability in processing simple or visual material without making errors [was] in the extremely low range when compared to his peers."  (*Id.*)

Plaintiff was diagnosed with intellectual disability, severe persistent depressive disorder, and mild tobacco use disorder.  (R. at 336.)  His illiteracy and insufficient social insurance or welfare support was also noted as part of his diagnoses.  (*Id.*)  Dr. Ludden opined that Plaintiff's prognosis was "guarded to poor with proper treatment."  (*Id.*)  His overall intellectual functioning was in the "moderately impaired range," and his academic achievement abilities were in the "mildly to moderately impaired range."  (*Id.*)  She further opined that Plaintiff would not be able to manage

benefits on his own and would need assistance to understand and file for government benefits. (*Id.*)

On August 11, 2014, Plaintiff presented to Dr. Jelani D. Ingram, M.D., complaining of back pain. (R. at 343-347.) He reported that his back pain started in 2012, but he never sought medical treatment. (R. at 345.) He described the back pain as sharp and achy, and it would radiate to both hands. (*Id.*) He rated his current pain level a 7 out of 10. (*Id.*) He stated that his back pain did not improve with any treatment and would worsen with lying down. (*Id.*) It was not the reason he stopped working, however. (*Id.*) Plaintiff also reported experiencing numbness in both hands and feet since 2014. (*Id.*) It radiated bilaterally in his arms and would worsen at night, but it was not affected by any particular activity. (*Id.*)

An x-ray scan of Plaintiff's cervical spine revealed small degenerative spurs (spondylosis) along the vertebral body endplates at C4-C5, C5-C6, and C6-C7, with mild degenerative face joint hypertrophy at C4-C5 and C5-C6. (R. at 339.) Plaintiff's range of joint motion was evaluated, and he displayed some limitation in his back. (R. at 343.) He was unable to perform range of motion of his hips and knees "due to obesity." (*Id.*) He exhibited full range of motion with his other extremities, however. (R. at 343-44.)

A physical examination revealed a "golf ball size[d] growth" at his right ear, edema in his knees, and tenderness to palpitation in his lumber spine. (R. at 346-47.) Dr. Ingram noted that Plaintiff was obese and appeared slightly uncomfortable at rest, including harsh breathing. (*Id.*) He had a waddling gait, but there were no other abnormalities noted from his neurologic examination. (R. at 347.) His upper and lower extremity strength was rated a 5 out of 5. (*Id.*) Dr. Ingram assessed Plaintiff with cervical spondylosis with myelopathy, unspecified congestive heart failure, morbid obesity, abnormality of gait, and elevated blood pressure. (R. at 347.) She opined that his

"current ability to do work related activities [was] limited," and he would be able to tolerate unlimited sitting; standing/walking for 20 minutes before taking a 10 minute break; and lifting and carrying objects no heavier than 20 pounds. (*Id.*) She noted "secondary to poor exercise tolerance." (*Id.*) His hearing and speaking were unimpaired. (*Id.*)

On July 31, 2014, Dr. Susan Posey, PsyD., completed a psychiatric review technique (PRT) form for Plaintiff. (R. at 35-37.) She opined that he had some limitations due to illiteracy and lower test scores, but his current limitations would not hinder him from all types of jobs. (R. at 35.) She noted the existence of an organic mental disorder and an affective disorder. (R. at 36.) She opined that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace, and in maintaining social functioning, but no limitations on activities of daily living. (R. at 36.) Plaintiff was "somewhat limited by symptoms," but the impact of those symptoms did not "wholly compromise the ability to function independently, appropriately, and effectively on a sustained basis." (R. at 37.) She further opined that Plaintiff's "alleged severity and limiting effects from the impairments [were] not wholly supported." (Id.)

Dr. Posey also completed a mental residual functional capacity assessment (RFC) for Plaintiff. (R. at 39-41) In her opinion, he was markedly limited in the abilities to understand and remember detailed instructions and to carry out detailed instructions. (R. at 40.) He exhibited moderately limited abilities in maintaining attention and concentration for extended periods and in asking simple questions and requesting assistance. (R. at 40-41.) She concluded that Plaintiff had the mental RFC to understand, remember, and carry out only simple instructions; make simple decisions; attend and concentrate for extended periods; interact adequately with co-workers and supervisors; and respond appropriately to changes in routine work setting. (R. at 41.)

On August 29, 2014, non-examining State agency physician, Karen Lee, M.D., completed a physical RFC assessment for Plaintiff. (R. at 36-39.) She assessed Plaintiff's physical impairment as a non-severe spine disorder. (R. at 36.) Dr. Lee opined that Plaintiff could: lift and/or carry up to 50 pounds occasionally and 20 pounds frequently; unlimited push and/or pull, other than shown for lift and/or carry; stand and/or walk and sit for a total of 6 hours in an 8-hour workday; occasionally climb ramps and stairs; occasionally stoop, kneel, crouch, and crawl; and never climb ladders, ropes, and scaffolds. (R. at 38-39.) The postural limitations she recommended were based on Plaintiff's morbid obesity and degenerative changes in the spine. (R. at 39.) She noted that Plaintiff had no treatment for his condition for the past year, and his physical examination showed normal range of motion and no severe neurological deficits. (*Id.*) Dr. Lee further opined that Plaintiff's self-reported limits were not wholly supported by the evidence on record. (*Id.*)

On January 28, 2015, non-examining State agency physician, Shabnam Rehman, M.D., prepared a physical RFC assessment of Plaintiff that generally mirrored Dr. Lee's physical RFC, except that Dr. Rehman did not assess any postural limitations. (R. at 49-50.) On February 2, 2015, Dr. Mischa Scales, Ph.D., reaffirmed Dr. Posey's mental RFC. (R. at 51-53.)

On February 19, 2016, Plaintiff presented to the emergency room (ER) at Navarro Regional Hospital complaining of confusion, general weakness, and abdominal pain. (R. at 374-455.) He rated his pain level a 5 out of 10. (R. at 380.) Physical examination of his abdomen and gastrointestinal revealed obesity and abdominal tenderness to palpitation, but no guarding or rebound. (R. at 376.) An examination of his back was negative for Costovertebral angle tenderness. (*Id.*) His neurology examination noted him as being oriented, but slow to respond, and appearing confused "mixed with moments of clear lucidity." (*Id.*) A CT scan of Plaintiff's abdomen revealed

cirrhosis and portal venous hypertension. (R. at 398.) Radiologist, Dr. William Woodard concluded that there was likely a small bowel obstruction in the region of the mid to distal small bowel. (*Id.*) A chest X-ray revealed the likelihood of congestive heart failure. (R. at 440.) A CT scan of Plaintiff's head revealed chronic small vessel ischemic changes. (R. at 442.)

Ted Kovacev, M.D., also examined Plaintiff and noted that he had "very poor insight with respect to the remainder of his medical condition." (R. at 400.) Plaintiff had not seen a doctor since he was a child. (*Id.*) He reported heavily drinking beer "for a long period of time," but denied other alcohol, tobacco, or recreational drug use. (*Id.*) Dr. Kovacev reported Plaintiff as being conversive, but his affect was "quite flat" and speech was "somewhat slow." (R. at 401.) Plaintiff required frequent redirection, did not answer some questions, and required frequent repetitive questioning to obtain minimal answers. (*Id.*) He exhibited decreased breath sounds with poor respiratory effort bilaterally and bilateral wheezing in the lower bases. (*Id.*) Dr. Kovacev observed a fluid wave in Plaintiff's abdomen and pitting edema in his bilateral lower extremities, and he initially assessed him with gastroenteritis. (R. at 402.) He further noted that Plaintiff required medical management for his "multiple" undiagnosed medical problems. (*Id.*)

On February 25, 2016, Plaintiff established care with Grady Shaw, M.D. (R. at 360-62.) He was accompanied by his mother, who reported that Plaintiff had been admitted to the ER because of bowel problems and "not thinking straight." (R. at 360.) Other than his ER visit, Plaintiff had not seen a doctor since he was a child. (*Id.*) Plaintiff complained of decreased appetite, diminished activity, coughing, hypertension, shortness of breath, swelling in his extremities, change in bowel habits, constipation, and headaches. (*Id.*) He weighed 256 pounds, and his blood pressure was 130/72. (R. at 361). He had decreased breath sounds and pitting edema in his lower extremities.

(*Id.*) His gait and coordination was noted as being normal. (*Id.*)

On March 17, 2016, Plaintiff returned to Dr. Shaw for a followup. (R. at 357-39.) Plaintiff reported "doing alright," but was having difficulty sleeping at night. (R. at 357.) He also reported decreased appetite, diminished activity, coughing, hypertension, shortness of breath, swelling, headaches, and a change in his sleep patterns. (R. at 358.) Dr. Shaw noted improvements with Plaintiff's appetite and shortness of breath. (*Id.*) Plaintiff weighed 252 pounds and his blood pressure was 134/70. (*Id.*) Plaintiff's was obese, and his gait and coordination were normal. (R. at 359.) Dr. Shaw reported that a prior CT scan revealed liver cirrhosis, and he prescribed Plaintiff Spironolactone and Metoprolol. (*Id.*)

On April 15, 2016, Plaintiff saw Dr. Shaw for a follow-up regarding his hypertension, and was accompanied by his mother. (R. at 354-56.) He stated: "I don't know why I am here. I just had an appointment. My back hurts. I'm sore in the legs too." (*Id.*) Plaintiff was coughing, and complained of back pain, myalgia, extremity pain, dizziness, headaches, tingling and numbness in his hands, and difficulty sleeping. (R. at 355.) Plaintiff weighed 270 pounds, and his blood pressure was 122/70. (*Id.*) He rated his pain level a 4 out of 10. (*Id.*) Dr. Shaw observed non-pitting edema in his lower extremity. (R. at 356.) His gait and coordination were normal. (*Id.*)

On May 23, 2016, Plaintiff presented to Providence Health Center for an upper abdomen ultrasound examination. (R. at 371.) The sonogram revealed a 4.2 cm calculus in the proximal left ureter causing moderate left hydronephrosis and bilateral renal calculi. (*Id.*) It was otherwise noted as being within normal limits. (*Id.*)

On June 7, 2016, Plaintiff presented to Dr. Shaw complaining of kidney stones, hypertension, shortness of breath, and swelling in his extremities. (R. at 350-351.) He was accompanied by his

mother, who stated that an ultrasound of Plaintiff's liver and kidneys showed "a stone in each kidney." (R. at 350.) He continued experiencing symptoms of headaches, dizziness, and numbness in his feet and hands. (R. at 350-51.) He weighed 274 pounds, and his blood pressure was 120/78. (R. at 351.) Dr. Shaw observed tenderness in the right upper quadrant of his abdomen. (*Id.*) His gait and coordination were normal. (R. at 352.)

### 3. Hearing Testimony

On April 21, 2017, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 10-32.) Plaintiff was represented by an attorney. (R. at 12.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that the highest grade he finished in school was twelfth grade, but he did not get a diploma. (R. at 16.) He temporarily attended special education classes, but returned back to regular classes to be with his friends. (*Id.*) He was not able to read or write and never did his school assignments. (R. at 16-17.) He used to have a driver's license but could not renew it because he needed eye glasses. (R. at 17.) Because he could not read or write, he passed the written driver's license test by cheating. (R. at 17-18.)

The last time Plaintiff visited a doctor was "a while ago," and he had not been to a hospital or ER since then. (R. at 18-19.) His last job was unloading trucks at a warehouse, and he was laid-off because of a business slowdown. (R. at 19.) Prior to the warehouse job, he worked for a company that required him to sit with a patient and administer medication. (*Id.*) Plaintiff knew what medication to administer because it was already prepared for him. (R. at 19-20.) He would work eight hours a day, and the job ended after his patient passed away. (R. at 20.) The company wanted to reassign Plaintiff to a new patient, but he lacked the means to travel to the little towns the patients

were in.  (*Id.*)  He previously worked as a janitor at a school.  (R. at 20-21.)  The job ended after he went to jail for something and was told that he could not return to his job.  (R. at 21.)  He did not have any felony convictions, however. (*Id.*)

When asked what medical issues would prevent him from working with patients again, Plaintiff responded that he was no longer able to lift patients in and out of the bed.  (R. at 21.)  Transportation was also an issue.  (R. at 22.)  His mother drove him to work when he was working with patients, and a friend drove him to and from work at the warehouse.  (*Id.*)

Plaintiff injured his back in a car wreck "a long time ago," but never had surgery for it. (R. at 22-23.)  After the accident, he went to therapy and received back massages.  (R. at 23.)  He was 5'4" and weighed 262 pounds. (*Id.*)  He exercised by walking for thirty minutes three days a week. (*Id.*)  He would try to walk a block or two, but was unable to walk the entire time and would need to stop and sit.  (*Id.*)  He did not do any other exercises.  (*Id.*)  His doctors told him that weight loss would help with his back pain, but Plaintiff admitted that he did not try to change his diet or do anything else.  (R. at 24.)  He was living with his mother.  (*Id.*)

When questioned by his attorney, Plaintiff stated that he would be unable to do his past work with patients because he had difficulty sleeping and struggled to get up in the morning.  (R. at 24-25.)  He would only sleep three to four hours at a time because he would have to go to the bathroom. (R. at 25.)  It took him "a couple of hours" to get ready in the morning because of his back pain. (R. at 26.)  He also struggled with bending down to put on his shoes.  (*Id.*)  He spent the majority of the day watching television, but did help with cleaning around the house and cooking breakfast.  (R. at 26-27.)  He would also go grocery shopping with his mother. (R. at 27.)  He lacked the desire to go out and visit friends and preferred to stay home and watch television.  (R. at 27.)  He was able to

pick up objects weighing 15-20 pounds and could carry groceries into the house.  (R. at 28.)

### b.      VE's Testimony

The VE classified Plaintiff's past relevant work as warehouse worker (medium, SVP-2), home health aide (medium, SVP-3), and janitor (medium, SVP-3).  (R. at 30.)  The VE considered a hypothetical person with Plaintiff's age, education, and work history and the following limitations: could lift and carry 50 pounds occasionally, and 25 pounds frequently; could stand and walk six of eight hours; could sit six of eight hours; could occasionally climb; could frequently stoop, crouch, or crawl; other postural movements not limited; was illiterate, but could understand, remember, and carry out one to two-step instructions provided orally.  (R. at 30.)  The person could perform Plaintiff's past work as a warehouse worker, given its SVP of 2 and medium strength classifications. (*Id.*)  If the RFC was reduced to light work, the hypothetical person would not be able to perform any past work, and there were no transferable skills.  (R. at 31.)  The VE confirmed that his testimony was not in conflict with the *Dictionary of Occupational Titles* (DOT).  (*Id.*)

### C.      ALJ's Findings

The ALJ issued her decision denying benefits on July 17, 2017. (R. at 59-68.)  At step one,[2] she determined that Plaintiff had not engaged in substantial gainful activity since April 23, 2014, the application date.  (R. at 61.)  At step two, she found that the medical evidence established that Plaintiff had a severe combination of the following impairments: intellectual deficit with mild depression, Hepatitis with cirrhosis, morbid obesity, mild degenerative disc disease, and heart disease.  (*Id.*)  At step three, the ALJ concluded that Plaintiff's severe impairments or combination of impairments did not meet or equal the requirements for presumptive disability under the listed

---

[2] The five-step analysis used to determine whether a claimant is disabled under the Social Security Act is described more specifically below.

impairments in 20 C.F.R. Part 404. (R. at 61-64.)

Next, the ALJ determined that Plaintiff retained the RFC to perform medium work as defined in 20 C.F.R. § 416.967(c), with the following limitations: he could lift or carry fifty pounds occasionally, and twenty-five pounds frequently; sit, stand, or walk for six hours in an eight-hour workday; could occasionally climb; could frequently stoop, crouch, and crawl; and was illiterate, but could understand, remember, and carry out one to two-step oral instructions. (R. at 64-67.)

At step four, the ALJ determined that Plaintiff could return to his past relevant work as a warehouse worker as he performed it, and as it was customarily performed in the national economy. (R. at 68.) She relied upon the VE's testimony to find that Plaintiff's impairments did not prevent him from performing his past relevant work as a warehouse worker. (*Id.*) Because the ALJ found that Plaintiff could return to his past relevant work, she did not reach step five. (*Id.*) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, since April 23, 2014, the date the application was filed. (*Id.*)

## II. ANALYSIS

### A. <u>Legal Standards</u>

#### 1. Standard of Review

Judicial review of the commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558,

564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

### 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4. If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(I)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Froga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.** **Issues for Review**

Plaintiff presents three issues for review:

I.      The ALJ's RFC determination is not supported by substantial evidence where the ALJ failed to afford appropriate weight to the only examining opinion in the record.

II.     The ALJ's RFC determination is not supported by substantial evidence where, after crediting the opinions of the State agency medical consultants, he failed to incorporate those opinions into his final RFC determination.

III.    The ALJ failed to reconcile the testimony of the vocational expert with the *Dictionary of Occupational Titles* when determining Plaintiff's ability to perform past relevant work as a warehouse worker.

(doc. 19 at 5.)

## C.      RFC Assessment[3]

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence. (doc. 19 at 13-19.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 416.945(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 416.945(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's

[3]  Because Plaintiff's first two issues implicate the ALJ's RFC assessment, they are considered together.

residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 160, 163–64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations, and reviewing the evidence of record, the ALJ determined that Plaintiff had the RFC to perform medium work, except that he could lift or carry fifty pounds occasionally, and twenty-five pounds frequently; sit, stand, or walk for six hours in an eight-hour workday; could occasionally climb; could frequently stoop, crouch, and crawl; and was illiterate, but could understand, remember, and carry out one to two-step oral instructions. (R. at 64.)

1.    **Treating Source Opinion**

Plaintiff first contends that the ALJ's RFC determination is not supported by substantial evidence because she failed to afford appropriate weight to Dr. Ingrams's treating source opinion. (doc. 19 at 13-17.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence.  20 C.F.R. § 416.927(b).  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.  *Id.* § 416.927(c)(2).  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight.  *Id.*  If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion."  *See id.* § 416.927(c)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).  If evidence supports a contrary conclusion, an opinion of any physician may be rejected.  *Id.*  A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is

conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 455-56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)."[4] *Id*. at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id*. at 458.

Here, the ALJ considered Dr. Ingram's August 11, 2014 opinion that Plaintiff's ability to do work related activities was limited, sitting was unlimited, standing/walking was limited to 20 minutes before a 10 minute break, and lifting and carrying objects was limited to 20 pounds, and he had secondary to poor exercise tolerance. (R. at 67, 347.) She noted Dr. Ingram's opinion that his sensation was normal and that his grip strength and reaching were unaffected. (*Id.*) She also noted her assessment of Plaintiff's overall general health as being well below average and secondary to his overall poor health and undiagnosed congestive heart failure. (*Id.*) The ALJ assigned "little weight" to Dr. Ingram's medical opinion "because it [was] inconsistent with the medical evidence of record, which showed [Plaintiff was] not receiving any consistent treatment for the physical impairments alleged." (R. at 67.)

The ALJ referenced Plaintiff's statement to Dr. Ingram that he began experiencing back pain

---

[4]  These are the same factors promulgated in 20 C.F.R. § 416.927(c)(1)-(6).

in 2012, but denied sustaining any back injury. (R. at 65, 345.) The limiting effects of his back pain were at odds with his statements that his back pain was not the reason he quit working. (R. at 65, 67.) She noted that Plaintiff had not received any medical treatment for his physical or mental impairments until February 19, 2016, and that "the medical evidence of record does not indicate the type of treatment (i.e. epidural steroid injunctions, physical therapy, pain medications, etc . . .), for the severity [of back pain] alleged." (R. at 66.) The ALJ also pointed to Dr. Shaw's treatment notes in February, April, and June of 2016 that "consistently noted normal gait and coordination." (*Id.*) Because the ALJ found that Dr. Ingram's opinions were inconsistent with the objective medical evidence, she could reject them as not controlling without the need to perform a factor-by-factor analysis. *See Newton*, 209 F.3d at 458; *Wilson v. Colvin*, No. 3:13-CV-1304-N, 2014 WL 1243684, at 8-9 (N.D. Tex. Mar. 26, 2014). Further, Dr. Ingram saw Plaintiff only once and had no doctor-patient relationship with him, so her opinions were not entitled to controlling weight. *See Rodriguez v. Shalala*, 35 F.3d 560, 1994 WL 499764, at *2 (5th Cir. 1994) (unpublished) (noting where the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded her opinion may fall correspondingly).

Plaintiff also argues that the ALJ failed to properly consider his inability to afford medical treatment to account for the lack of consistent treatment for his physical impairments. (doc. 19 at 16.) If a "claimant cannot afford prescribed treatment or medicine, and can find no way to obtain it, 'the condition that is disabling in fact continues to be disabling in law.'" *Lovelace*, 813 F.2d at 59 (citing *Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986)). An ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or

pursue regular medical treatment without first considering any explanations that the individual may provide. . . For example. . . [t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services." SSR 96-7p, 1996 WL 374186, at *7-8.

Plaintiff cites to notations by Dr. Ludden that he could not afford to go to the doctor because he did not have health insurance (R. at 332), and that he lacked welfare support (R. at 336). An inability to afford treatment by itself is insufficient, however. *Lovelace*, 813 F.2d at 59. A claimant must also show that he could not obtain medical treatment from other sources, such as free or low-cost health clinics. *See id.* (a condition is disabling in law if a "claimant cannot afford prescribed treatment or medicine, *and* can find no way to obtain it") (emphasis added); *see also* SSR 96-7p, 1996 WL 374186, at *8 (statements may be credible if a claimant cannot afford treatment and does not have access to free or low-cost medical services). Plaintiff has not provided any evidence to show that he lacks access to free or low-cost medical services. Because he has not shown that he did not have access to free or low-cost medical services, the requirement that the ALJ consider his inability to pay for medical treatment does not apply. *Lovelace*, 813 F.2d at 59. Remand is therefore not required on this issue.

## 2. SAMC Opinions

Plaintiff also argues that the ALJ's RFC determination is not supported by substantial evidence because she credited the opinions of State agency medical consultants but failed to incorporate those opinions in her RFC. (doc. 19 at 17-19.)

State agency medical consultants, or SAMCs, are considered experts in Social Security disability determination, and their opinions may be entitled to great weight if they are supported by the evidence. *Hardin v. Astrue*, No. 3:10-CV-1343-B, 2011 WL 1630902, at *7 (N.D. Tex. Mar. 31,

2011), *adopted by* 2011 WL 1633132 (N.D. Tex. Apr. 29, 2011). Although the ALJ is solely responsible for assessing the claimant's RFC, she must consider any opinion by an SAMC in making this assessment. SSR 96-6p, 1996 WL 374180, at *4 (S.S.A. July 2, 1996). "RFC assessments by [SAMCs] . . . are to be considered and addressed in the [ALJ's] decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s)" and "are to be evaluated considering all of the factors . . . for considering opinion evidence" outlined in 20 C.F.R. § 416.927(c). *Id.* The ALJ is not required to expressly discuss each finding by an SAMC or discuss each factor listed in 20 C.F.R. § 416.927(c), however, because such a detailed analysis applies only to the ALJ's rejection of a treating source's uncontradicted opinion. *See Newton*, 209 F.3d at 456-58. The ALJ also "must explain the weight given to these opinions in [her] decision[]." SSR 96-6p, 1996 WL 374180, at *4. Moreover, where substantial evidence supports the ALJ's decision, the failure to consider every single opinion or statement of a SAMC may constitute harmless error. *See Alejandro v. Banhart*, 291 F. Supp.2d 497, 516–17 (S.D. Tex. 2003) (the ALJ's failure to consider or document a state agency consultant's opinion is reversible error only if substantial evidence does not support the ALJ's decision).

Here, the ALJ explicitly stated that she considered the RFC conclusions reached by the SAMCs in accordance with SSR 96-6p. (R. at 67.) She noted that the SAMCs considered Plaintiff's back pain "non-severe," and found him not disabled. (*Id.*) She attributed "some weight" to their opinions, which she explained was particularly deserved given the "number of other reasons to reach similar conclusions (as explained throughout this decision)." (*Id.*) On Plaintiff's physical impairments, Dr. Lee, opined that Plaintiff's allegations were partially supported by the evidence of record. (R. at 39.) She concluded that Plaintiff could occasionally lift and/or carry 50 pounds and

frequently lift and carry 20 pound; sit and stand and/or walk for a total of about six hours in an eight-hour workday; push and/or pull the weights identified for lift and/or carry; climb ramps and stairs occasionally; and occasionally stoop, kneel, crouch, and crawl. (R. at 38-39.) Dr. Lee noted that Plaintiff had no treatment for his condition for the past year, and his physical examination showed normal range of motion and no severe neurological deficits. (*Id.*) Dr. Lee's opinion was largely affirmed by Dr. Rehman, the other SAMC who considered Plaintiff's physical impairments on reconsideration, but disagreed that Plaintiff had postural limitations. (R. at 49-50.) Dr. Rehman's RFC was the same as Dr. Lee's, except it did not include limitations of occasionally climb stairs and occasionally stoop, knee, crouch, and crawl. (*Id.*) Plaintiff's examining physician, Dr. Ingram, opined that Plaintiff had limited abilities in work related activities, but she did not offer an opinion on any postural limitations. (R. at 347.) As noted, the ALJ attributed "little weight" to this opinion. (R. at 67); *see Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir.1981) (holding that the ALJ "was justified in accepting the opinion of [a non-treating, consultative physician] . . . that was supported by the evidence, and in rejecting the [opinion] of . . . a treating physician that was contrary to the evidence") (citing to 20 C.F.R. § 404.1526). The ALJ concluded that Plaintiff had postural limitations and that he could climb occasionally and stoop, crouch, and crawl frequently. (R. at 64.)

Although the ALJ noted she was attributing "some weight" to the opinions of the SAMC, she implicitly rejected Dr. Lee's findings that Plaintiff could occasionally stoop, kneel, crouch and crawl, as well as Dr. Rehman's findings of no postural limitations. Nevertheless, substantial evidence supports the ALJ's RFC and implicit rejection of both SAMCs opinions. In her narrative discussion, she noted that Plaintiff's "physical examinations after his hospitalizations were essentially normal." (R. at 66.) She highlighted treatment records from Dr. Shaw that were

generated after the SAMCs rendered their opinions that "consistently noted normal gait and coordination in February, April, and June of 2019." (R. at 66, 350-62.) Although Plaintiff was noted as being more limited in his work related activities in August of 2014, the medical record demonstrate that his physical limitations had improved since the SAMCs rendered their opinions. (*See* R. at 345-47, 350-62.) The more recent improvement in Plaintiff's gait and coordination supports the RFC determination that Plaintiff could frequently stoop, kneel, crouch and crawl rather than occasionally as was opined by Dr. Lee. (*See* R. at 350-62.) Moreover, the medical evidence of Plaintiff's degenerative disc disease and obesity support the RFC including some postural limitations rather than no postural limits, as provided in Dr. Rehman's RFC. *See Martin v. Heckler,* 748 F.2d 1027, 1031 (5th Cir. 1984) (explaining that a state agency medical consultant's opinion does not constitute substantial evidence when it is consistently contradicted by the medical evidence in the record).

While the postural limitations of Dr. Lee conflicted with Dr. Rehman's RFC findings, it was entirely within the ALJ's purview to resolve any conflicts in the evidence because such conflicts are for the Commissioner, and not the courts, to resolve. *See Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002). Moreover, she was "free to reject the opinion of any physician when the evidence support[ed] a contrary conclusion." *Newton,* 209 F.3d at 455. In any event, the ALJ's RFC decision can be supported by substantial evidence even if she did not specifically discuss all the evidence that supported her decision or all the evidence that she rejected. *See Falco,* 27 F.3d at 164; *see Hunt v. Astrue,* No. 4:12-CV-244-Y, 2013 WL 2392880, at *7 (N.D. Tex. June 3, 2013) ("The ALJ is not required to discuss every piece of evidence in the record nor must the ALJ follow formalistic rules of articulation."). Because substantial evidence supports the ALJ's implicit rejection of the opinions

of the SAMCs on postural limitations, remand is not required on this issue.

In summary, the ALJ's RFC determination was supported by substantial evidence.

**D.    Ability to Perform Past Relevant Work**

Plaintiff contends that the ALJ relied on erroneous VE testimony that conflicted with the classification in the DOT of his past work without resolving the conflict between the two. (doc. 19 at 19-21.)

The DOT and its supplement, the Selected Characteristics of Occupations (SCO) defined in the Revised DOT, "comprise a comprehensive listing of job titles in the United States, along with detailed descriptions of requirements for each job, including assessments of exertional levels and reasoning abilities necessary for satisfactory performance of those jobs." *Veal v. Soc. Sec. Admin.*, 618 F. Supp.2d 600, 608–09 (E.D. Tex. 2009); *see Conaway v. Astrue*, No. 3:07–CV–0906–BD, 2008 WL 4865549, at *5 (N.D. Tex. Nov. 10, 2008) ("The DOT was promulgated by the Department of Labor to provide 'standardized occupational information to support job placement activities'. . . . [and] contain descriptions of the requirements for thousands of jobs in the national economy.") (internal citations omitted); *see Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).

**1.    Conflict with the DOT**

Because conflict between VE testimony and the DOT occurred with some frequency, the Commissioner issued SSR 00–4p to ensure that ALJs would expose and reconcile such conflict before relying on VE testimony.[5] SSR 00–4p, 2000 WL 1898704 (S.S.A. 2000).  SSR 00–4p

---

[5]  SSRs represent "statements of policy and interpretations" adopted by the Social Security Administration that are "binding on all components" of the Administration. 20 C.F.R. § 402.35(b)(1).  While binding on the Administration, these interpretive rulings are not binding on the courts, so courts need not give them the force and effect of law. *Batterton v. Francis*, 432 U.S. 416, 425 n. 9 (1977) (noting the varying degrees of deference the rulings may be afforded); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (per curiam).  However, courts may "rel[y] upon the rulings in evaluating ALJs' decisions." *Myers*, 238 F.3d at 620.

establishes the ALJ's affirmative duty to bring to light and explain any "apparent unresolved conflict" between the VE's testimony and the DOT. *Id.* at *2. As part of her duty to fully develop the record at the hearing level, the ALJ must inquire on the record whether or not there is such an inconsistency. *Id.* at *4; *see Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016) (citations omitted). The ALJ must also explain in the decision how any identified conflict was resolved. SSR 00–4p, 2000 WL 1898704, at *4. Neither the DOT nor VE testimony automatically trumps when there is a conflict. *Id.* at *2; *Siller v. Barnhart*, No. SA–04–CA–0514 FBNN, 2005 WL 1430361, at *7–8 (W.D. Tex. June 17, 2005) (finding that neither the DOT nor VE testimony should automatically be accorded controlling weight). Nevertheless, occupational evidence provided by a VE generally should be consistent with the occupational information supplied by the DOT. SSR 00–4p, 2000 WL 1898704, at *2. A claimant is not required to raise the issue of any discrepancy at the hearing, however. *Romine v. Barnhart*, 454 F. Supp.2d 623, 627–28 (E.D. Tex. 2006) (citing *Prochaska v. Barnhart*, 454 F.3d 731, 735–3 6 (7th Cir. 2006)).

A direct conflict may arise when the VE's testimony regarding the exertional or skill level of a particular job is facially different than that indicated in the DOT, or when the VE's testimony creates a conflict between the ALJ's RFC determination and the description of the jobs in the DOT. *See Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000). Conversely, implied conflicts and exceptions occur under various unique circumstances when VEs are called to testify as to an individual claimant's capabilities. *See id.* at 146-47. Because the DOT cannot satisfactorily address every such situation, claimants are not permitted to scan the record for implied or unexplained conflicts and then present the conflict as reversible error. *See id.*

In this case, the ALJ considered the VE's testimony and the DOT in determining Plaintiff's

past relevant work and whether an individual with Plaintiff's residual functional capacity could perform his past relevant work. (*See* R. at 68.) The VE identified Plaintiff's past work as warehouse worker, DOT code 922.687-058. (R. at 29-30.) The VE further identified warehouse worker as being defined with an "SVP of 2" and medium strength. (R. at 30.) The ALJ's hypothetical to the VE was based on Plaintiff being illiterate, but able to "understand, remember, and carry out one to two-step instructions given orally." (*See* R. at 30.)

In the DOT, 922.687-058 [Warehouse Worker] is described as requiring Level 2 reasoning abilities, which is defined as being able to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." *See* Dep't of Labor, D.O.T. 922.687-058, 1991 WL 688132 (G.P.O. 1991). The position is also described as having Level 1 language abilities, which includes the reading ability to "[r]ecognize meaning of 2,500 (two- or three-syllable) words;" "[r]ead at [a] rate of 95-120 words per minute;" and "[c]ompare similarities and differences between words and between series of numbers." *Id.* A person with Level 1 language ability must also be able to "[p]rint simple sentences containing subject, verb, and object, and series of numbers, names and addresses." *Id.* The VE's testimony directly conflicted with the DOT because he testified that an individual who is "not literate" could still perform the job of a warehouse worker. (*See* R. at 30.) The DOT description classifies warehouse worker as SVP-2 and describes reading and writing requirements beyond the abilities of a "not literate" individual. 1991 WL 688132. The ALJ had an obligation under SSR 00–4p to resolve this conflict but did not.[6] (*See* R. at 59-68.)

---

[6] In her written decision, the ALJ concluded that "the vocational expert's testimony is consistent with the information contained in the *Dictionary of Occupational Titles*." (R. at 68.) This finding is insufficient because "[t]here is no provision in SSR 00–4p for the ALJ to determine on his own if there is a discrepancy between the VE's testimony and the DOT; the ALJ must elicit the information from the VE on the record." *Jones v. Colvin*, No. 3:11-CV-2818-BH, 2013

27

The Commissioner contends that the VE can rely on her experience over the "broad generalizations" of the DOT when testifying. (doc. 20 at 19.) In *Carey v. Apfel,* however, the Fifth Circuit expressed an unwillingness to defer to a VE without explanation. 230 F.3d at 147. It "[a]dopt[ed] a middle ground approach, in which neither the DOT nor the vocational expert testimony is per se controlling." *Id.* (also stating that "a vocational expert's erroneous characterization of the exertional level or skills required to perform a particular job calls into question both the probative value and reliability of the expert's testimony"). "When a 'direct and obvious' conflict exists between the VE's testimony and the DOT and the ALJ fails to explain or resolve the conflict, the testimony is 'so lessened that reversal and remand for lack of substantial evidence usually follows.'" *Osborne v. Colvin*, No. 14–CV–1299–BN, 2015 WL 4755488, at *7 (N.D. Tex. Aug. 12, 2015) (citing *Carey*, 230 F.3d at 146 and *Gaspard v. Soc. Sec. Admin., Comm'r*, 609 F. Supp.2d 607, 613 (E.D. Tex. 2009)). Such a conflict existed here. *See Olive v. Colvin*, No. CV 16-559, 2017 WL 1653303, at *8 (E.D. La. Mar. 31, 2017), *adopted by* 2017 WL 1592488 (E.D. La. Apr. 28, 2017) (finding direct conflict between the VE's testimony and the DOT, when the VE did not provide testimony explaining why jobs classified as requiring Language Level 2 could be performed by an illiterate person); *see also Mora v. Astrue*, No. EDCV 07-1527MAN, 2008 WL 5076450, at *2 (C.D. Cal. Dec. 1, 2008) (citing *Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001) (remanding for further proceedings when ALJ failed to explain finding that plaintiff could perform job with Language Level 1 requirement when she was illiterate in English).

The Commissioner also contends that Plaintiff's counsel should have raised the conflict at the hearing and cross-examined on it. (doc. 20 at 18.) Under SSR 00–4p, however, the ALJ must

---

WL 1285486, at *21 (N.D. Tex. Mar. 29, 2013) (citing SSR 00–4p, 2000 WL 1898704, at *2).

explain in the decision how any identified conflict was resolved. SSR 00–4p, 2000 WL 1898704, *1–2. SSR 00–4p does not limit the ALJ's obligation to *pro se* parties. *See id.* The ALJ had the responsibility to ask about any possible conflicts between the VE's testimony and the DOT *and* to resolve those conflicts. *Id.* Although the ALJ asked about potential conflicts between the VE's testimony and the DOT in accordance with Social Security Ruling 00–4p (R. at 30), the VE's response in the negative was in direct conflict with the DOT due to the discrepancy between the reasoning and reading/writing abilities of the hypothetical person and that of a warehouse worker as defined in the DOT. *See Dunn v. Colvin*, No. 4:12-CV-496-Y, 2013 WL 4756377, at *5 (N.D. Tex. Sept. 4, 2013) (citing *Carey*, 230 F.3d at 146–47) (holding that where there was a direct conflict between the vocational expert's testimony and the DOT, the claimant "did not need to raise the conflict at the hearing or risk waiving it"). By failing to address this direct conflict, the ALJ erred.[7]

## 2. Harmless Error

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected. . . . The major policy underlying the harmless error rule is to preserve judgments and to avoid waste of time." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)) (per curiam). "[P]rocedural improprieties . . . will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence

---

[7] Regardless, even if the conflict between the VE's testimony and the DOT was considered "indirect," which potentially rendered the issue "waived" because it was not raised and developed by Plaintiff during cross examination, "once it is raised in an action for judicial review, the court must still investigate whether the record reflects an adequate basis" for relying on a VE's testimony. *Dugas v Astrue*, No. 1:07–CV–605, 2009 WL 1780121 * 6 (E.D. Tex. June 22, 2009) (citing *Carey*, 230 F.3d at 146) (internal quotations omitted).

of substantial evidence to support the ALJ's decision." *Alexander v. Astrue*, 412 F. App'x 719, 722 (5th Cir. 2011) (per curiam) (emphasis added) (quoting *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)). The ALJ's error is harmless if the substantial rights of a party have not been affected. *See Alexander*, 412 F. App'x at 722; *see also Webb v. Astrue*, No. 4:08-CV-747-Y, 2010 WL 1644898, at *11 (N.D. Tex. Mar. 2, 2010) (applying harmless error analysis to the ALJ's failure to give weight to an SAMC's opinion and finding there was substantial evidence to support the ALJ's RFC determination), *adopted by* 2010 WL 1644697 (N.D. Tex. Apr. 22, 2010).

The Fifth Circuit has ruled that even when the ALJ fails to discover and address conflicts between the testimony of a VE and the DOT, the claimant is not entitled to relief unless she can show that she was prejudiced by the alleged error. *DeLeon v. Barnhart*, 174 F. App'x 201, 203 (5th Cir. 2006) (per curiam) (citing *Mays*, 837 F.2d at 1364); *see, e.g., Prochaska*, 454 F.3d at 735–36 (noting that the ALJ's legal error in failing to ask about a conflict negated the claimant's responsibility to raise the issue); *Burns v. Barnhart*, 312 F.3d 113, 126–27 (3d Cir. 2002) (remanding for the ALJ to handle the conflict in accordance with SSR 00–4p). A claimant establishes the requisite prejudice by showing that, "if the ALJ had fully developed the record," additional evidence would have been produced that "*might* have led to a different decision." *Newton*, 209 F.3d at 458 (emphasis added).

Here, the ALJ's failure to adhere to SSR 00-4p prejudiced Plaintiff because the evidence that would have resulted from compliance with the ruling might have led to a difference decision. *See Jackson v. Astrue*, No. 4:11-CV-28-Y, 2011 WL 4943547, at *11-12 (N.D. Tex. Aug 23, 2011), *adopted by*, 2011 WL 4940998 (N.D. Tex. Oct. 17, 2011); *Newton*, 209 F.3d at 458. Questions regarding the conflict could have clarified that the VE's testimony was based on Plaintiff's prior past

work, as the Commissioner alleges, or that Plaintiff was incapable of working as a warehouse worker. A court cannot assume the existence of evidence not in the record, or resolve a conflict that the ALJ did not consider. *See Newton*, 209 F.3d at 455 ("The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council."). The requirement for establishing prejudice has been satisfied because it is possible that this evidence would have caused the ALJ to make a different determination regarding Plaintiff's ability to perform the job of warehouse worker.

Accordingly, Plaintiff has demonstrated that he was prejudiced and that a substantial right has been affected. The error is therefore not harmless, and remand is required.

### III. CONCLUSION

The Commissioner's decision is **REVERSED**, and the case **REMANDED** to the Commissioner for further proceedings.

SO ORDERED on this 29th day of March, 2019.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE